**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:08cv419**

| | | |
|---|---|---|
| **AGDATA, LP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF DECISION** |
| | ) | **AND** |
| | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| **RAJ GUPTA, a/k/a Raaj Gupta,** | ) | |
| **a/k/a Rajan Gupta d/b/a** | ) | |
| **Green Data Solutions,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for

Temporary Restraining Order and Preliminary Injunction [Doc. 6], filed

September 25, 2008, and the Defendant's Motion to Revoke Entry of

Default, Dismiss the Hearing for Preliminary Injunction [Doc. 13], filed

October 17, 2008.

## PROCEDURAL HISTORY

The Plaintiff Agdata, LP (Agdata) initiated this action on September

11, 2008, alleging claims for (1) copyright infringement pursuant to 17

U.S.C. §501; (2) breach of contract in the form of an asset purchase

agreement; (3) breach of contract in the form of an employment contract; (4) a violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §66-152; (5) violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. §75-1.1; (6) equitable relief in the form of a permanent injunction; and (7) an award of attorneys' fees. [Doc. 1].

Defendant Raj Gupta (Gupta) was served on September 15, 2008, making his Answer due on October 6, 2008. [Doc. 5]. On September 25, 2008, Agdata moved for a temporary restraining order and preliminary injunction and effected service on Gupta. [Doc. 6; Doc. 8].

When Gupta failed to answer the Complaint timely, Agdata moved for entry of default. [Doc. 9]. On October 7, 2008, the Clerk of Court entered default. [Doc. 10]. After the entry of default but on the same date, Gupta filed an answer in a *pro se* capacity. [Doc. 12].

The parties were provided notice that a hearing would be held on October 21, 2008 on the pending motion for a temporary restraining order and preliminary injunction and such other relief as may be applicable in light of Defendant's default. [Doc. 11]. Gupta thereafter moved to "dismiss" the hearing and to set aside the default. [Doc. 13]. The hearing

was conducted on October 21, 2008 at which time both parties were present.  Gupta appeared *pro se*.

## FACTUAL BACKGROUND

During the hearing, the Court addressed Gupta concerning his failure to file his Answer with the Court on or before October 6, 2008.  Gupta explained that he emailed his Answer to counsel for Agdata on October 5, 2008 and placed it in the mail to the Court on October 6, 2008.[1]  Gupta claimed that the website for the United States District Court advised that service would be complete as long as he mailed the Answer on the date it was due.  He did not further identify which court's website he consulted, and it is noted that Gupta lives in California.  On that date, October 6, 2008, he mailed to the Court a signed Answer by priority mail.

At the hearing, counsel for Agdata acknowledged that the motion for a temporary restraining order had become moot.  The evidence presented in support of the motion for a preliminary injunction is contained within the record of the case and is referenced herein.  To the extent that any reference is made to evidence presented during the hearing, it will be so noted.

---

[1]The Answer sent via email was not signed.  The Answer sent to the Court was signed.

In 2002, Gupta and another individual, David Jackson,[2] formed a company called Health Data Logistics (HDL). [Doc. 1 at ¶7]. HDL created a software system called RapidClaims, an electronic claims submissions system for the healthcare industry. [Id.]. HDL copyrighted the software as RapidClaims. [Id. at ¶8].

Agdata is in the business of providing computer data management services to companies, including the healthcare industry. [Id. at ¶2]. In December 2006, Agdata entered into an asset purchase agreement (APA or Agreement) pursuant to which it bought the assets of HDL, including the RapidClaims software and copyright. [Id. at ¶9]. After the purchase, RapidClaims was rebranded ClaimsREDI. [Id.]. On July 18, 2007, Agdata registered a copyright of the ClaimsREDI software with the United States Copyright Office, which issued a certificate of registration. [Id. at ¶15; Doc. 1-6 at 1-2]. In addition to purchasing the software and copyright at issue, Agdata negotiated a non-compete clause in the APA prohibiting Gupta from competing with Agdata or soliciting its customers for a period of three years after the date of sale. [Doc. 1 at ¶17]. It also prohibited Gupta from

[2]Mr. Jackson is not a party to this action.

investing in or lending money to any person or entity in competition with Agdata for three years.  [Id.].

At the same time that Agdata purchased HDL's assets, Agdata entered into an employment agreement with Gupta.  [Id. at ¶10].  Under the terms of that agreement, Agdata could terminate Gupta's employment for cause if the sales of ClaimsREDI software did not reach $700,000 by the end of 2007.  [Id. at ¶11].  When that level was not reached Agdata terminated Gupta's employment,  [Id. at ¶12], and negotiated a new employment agreement effective January 1, 2008. (Second Employment Agreement).  Pursuant to the terms of the Second Employment Agreement, Agdata could terminate Gupta's employment without cause on 30 days notice.  [Id. at ¶14].  Gupta was employed pursuant to this Agreement as the technical operations advisor for an Agdata subsidiary located in California known as Diversified Data Design (DDD).  [Doc. 1-5 at 1].  His job was to provide technical support for the sales strategies for the ClaimsREDI product line. [Id.].

The Second Employment Agreement contains a non-compete clause prohibiting Gupta from competing with Agdata for a one year period after a

termination of employment.  [Doc. 1 at ¶16; Doc. 1-5 at 3].  Gupta was

terminated by Agdata on June 30, 2008.  [Doc. 1 at ¶14].

The covenant not to compete in the Second Employment Agreement

defines the prohibited "competitive acts" as (1) performing services that are

similar or substantially similar to Gupta's duties at Agdata for any customer

of Agdata within the "territory;" (2) soliciting customers of Agdata for the

purpose of providing goods or services identical to or reasonably

substitutable for Agdata's services; (3) consulting with or lending

knowledge or assistance of information gained while employed with Agdata

to any person or entity competing with Agdata; and/or (4) investing capital

or lending money to any competitor.  [Doc. 1-5 at 3].  The Agreement

defines "customer" as "all persons or entities to whom [Agdata] has

previously made actively periodic sales or regular sales, or actively

provided periodic services or regular services during the three (3) year

period immediately preceding the date of the termination of [Gupta's]

employment hereunder."  [Doc. 1-5 at 4].  The term "territory" is defined

broadly to encompass the entire United States.  [Id.].  There are separate

covenants for non-interference with customer relations and suppliers and

an agreement not to disclose trade secrets, including software, designs,

data and copyrights. [Id. at 5-6]. There is also a provision in which Gupta specifically agreed to injunctive relief in the event of a breach or threatened breach. [Id. at 8]. The contract also includes choice of law and forum selection clauses specifying North Carolina law and venue. [Id. at 11].

The APA contains a non-compete clause for a three-year period from the date of closing pursuant to which Gupta contracted that he would "not in any way or in any capacity (as an employee, independent contractor, partner, shareholder, director, officer, consultant or otherwise), ... *directly or indirectly*, do any of the following competitive acts:" (1) solicit customers within the defined territory "for the purpose of providing goods or services identical to or reasonably substitutable" for those of Agdata; (2) consult with or lend knowledge or assistance of information gained while employed with Agdata to any person or entity competing with Agdata; and/or (3) invest capital or lend money to any person or entity in competition with Agdata. [Doc. 1-3 at 37-38 (emphasis provided)]. The APA defines "customer(s)" differently from the Second Employment Agreement. Specifically, the APA defines "customer(s)" as follows:

> (1) all persons or entities to whom [Agdata] has previously made actively periodic sales or regular sales, or provided actively periodic services or regular services during the three (3) year period immediately

7

> preceding the date of the Closing of the Transaction
> which were not customers of HDL prior to the Closing,
> and (2) the customers of HDL existing as of the date
> of the Closing, which are being acquired by [Agdata]
> and which were not customers of [Agdata]....

[Doc. 1-3 at 38]. The term "person" is defined to include "any individual ... or any other legal entity or enterprise." [Id.].

The APA also contains a confidentiality provision which, among other things, specifically related to software and other proprietary information. [Id. at 39-40]. The Agreement acknowledges that injunctive relief would be appropriate in the event of a breach and requires the application of North Carolina law. [Id. at 42].

Brian Shell is the Vice President of Marketing for Agdata. [Doc. 7-3 at ¶2]. He provided a declaration in support of the motion for a preliminary injunction in which he testified that the copyrighted ClaimsREDI software allows medical providers to put their insurance claim data into the system and the software automatically reformats the information into the form required by the insurance company to which the claim is submitted. [Id. at ¶4]. This saves the medical provider a significant amount of time in data processing and training of support staff, thus resulting in lower costs to the provider. [Id.]. Shell supervised Gupta while he was employed by Agdata

from December 15, 2006 through June 30, 2008.  [Id.].  Gupta worked on

the continuing development and marketing of the copyrighted ClaimsREDI

software.  [Id.].  In order to make such revisions and development of the

software, Gupta of necessity had access to the software code.  [Id. at

¶¶10, 12].

Shell also stated in his Affidavit that Agdata owns a software

development company in India, and that Gupta kept copies of the

ClaimsREDI source code on that Indian company's computer system.  [Id.

at ¶12].  During the hearing, Gupta conceded that he had access to the

code comprising Agdata's software while employed by Agdata, both before

and after the asset purchase.

Shell further testified that during the time that Gupta was employed

by Agdata, the company was developing certain functionality known as the

Encounter Bypass project, to be used with the copyrighted ClaimsREDI

software which would automate certain data transfers between various

levels of health care providers and health plans.  [Id. at ¶11].  This

functionality, which Shell described as a trade secret, has never been

developed or offered by any other company.  [Id.].  Gupta worked on this

project while he was employed by Agdata.  [Id.].  Thus, Gupta has

conceded that he knew the source code for the copyrighted ClaimsREDI software, and it is undisputed that he worked on the Encounter Bypass project.

After he was terminated, Gupta formed Green Data Solutions, a software system which performs the same functions as ClaimsREDI.  [Id. at ¶¶8-10; Doc. 7-5 at 1-2].  Gupta also incorporated into the Green Data Solutions software the Encounter Bypass feature which Agdata had been incorporating into ClaimsREDI software but which had not yet been released to the public.  [Id. at ¶11; Doc. 7-6 at 1].  Indeed, Gupta did not even change the name of the feature.  [Id. ("Introducing for THE FIRST TIME Encounter Bypass")].

On August 4, 2008, Gupta sent an email to Agdata customers soliciting them to purchase his software product.  [Doc. 1-7 at 1].  In those emails, Gupta identified himself as the inventor and developer of the ClaimsREDI software and admitted that he was no longer associated with its development.  [Id. ("This is Raaj Gupta, Founder and Original Developer of ClaimsREDI, a system you may be familiar with–that is currently been [sic] used and sold by DDD, of which I am no longer associated with.")].  The email touted Greed Data Solutions' "new system [which] allows you to

send/receive claims–which will save you money by reducing labor, by automatically submitting your claims as encounters to Health Plan/DDD." [Id.].  During the hearing, Gupta conceded that he wrote and sent the email in question and, variously, conceded that he had access to the ClaimsREDI software.

In addition, Gupta developed a slide show for his product which could be viewed from his website, www.greendatasolutions.com.  [Doc. 1-8 at 1-5].  The slide show states that it introduces "FOR THE FIRST TIME" the "Encounter Bypass" system and shows as the name of a customer, Sharp Community, which is a customer of Agdata.[3]  [Id. at 3].  Agdata argued during the hearing that this proves Gupta used knowledge he gained while employed by Agdata, as shown by his use of both of the Encounter Bypass system and the confidential name of a customer.  Gupta used his knowledge of the software and Encounter Bypass program to place it in his competing software and began to use it to compete against Agdata before

_____

[3]Agdata attached to its motion for a preliminary injunction the declaration of Noelle Porter, who stated therein that Sharp Community Health is a ClaimsREDI customer.  [Doc. 7-7 at 2].  During the hearing, Gupta admitted that the email went to entities which were Agdata customers during his employment with Agdata.  He argued that since Agdata refused to provide him with a copy of its customers, it was not a breach of the agreement to send out mass mailings.  "I am not trying to specifically target Agdata's customers.  I am just targeting everyone in the industry."  [Doc. 1-10 at 1].

Agdata had marketed the Encounter Bypass product.  [Doc. 7-3 at ¶¶11-12].  In addition to violating its copyright and the contractual confidentiality provisions, Agdata claimed that Gupta solicited sales for his product which performs the same function as Agdata's software in violation of the APA and employment agreement.  Agdata further argued that the fact that Gupta could do so within thirty days of leaving Agdata's employment showed that Gupta must have relied on information, confidential information and source code he learned while employed at Agdata.  [Id. at ¶10].

Many of the customers solicited by Gupta contacted Agdata to alert it to Gupta's conduct.  [Doc. 7-3].  Gupta sent another email in mid-September in which he claimed that Green Data Solutions "is in great shape to provide you with all the services you need[.]"  [Doc. 7-4].  In that email, Gupta solicited business and made remarks concerning Agdata.  [Id.].

During the hearing, Gupta argued that his software program differs from that of Agdata because it serves a different purpose, although that purpose was not made clear.  He also argued that based on a view of the website for his product, it was not possible to make a conclusion regarding

the content of the software.  Gupta denied that the software programs express similar ideas with regard to the submission of insurance claims. Gupta also argued that because he does not currently have access to the ClaimsREDI software, he cannot compare it to the Green Data Solutions software.

On the issue of soliciting customers and using knowledge he had gained to help any person in competition with Agdata, Gupta argued that he was not trying to sell his Green Data Solutions software.  Instead, he claimed that he was looking for investors in the product in order to develop it.  This he claimed was allowed under the language of both non-compete provisions.  Finally, Gupta conceded that Agdata was entitled to an injunction but noted that he did not know in what manner he could comply with it without full disclosure of Agdata's customer list.  He also acknowledged that he could get a job doing claims processing for another company in the healthcare industry or even selling another company's system without being unduly harmed.  Gupta also argued, but offered no evidence, that although Agdata had shown that he solicited its customers, it had failed to show that Gupta infringed on the copyright because the Green Data Solutions' software does not belong to him.

## STANDARD OF REVIEW

Rule 55(c) of the Federal Rules of Civil Procedure provides that a court may set aside an entry of default for "good cause."

> When deciding whether to set aside an entry of default, a district court should consider whether the moving party has a meritorious defense, whether it acted with reasonable promptness, the personal responsibility of the defaulting party, the prejudice to the parties, whether there is a history of dilatory action, and the availability of sanctions less drastic.

Payne ex. rel. Estate of Calzada v. Brake, 439 F.3d 198, 204 (4th Cir. 2006) (citation omitted).

> Section 502(a) of the Copyright Act, 17 U.S.C. §502(a), authorizes a federal court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." In this circuit, a district court deciding a motion for preliminary injunction should consider four factors: (1) the plaintiff's likelihood of success on the merits of the underlying dispute; (2) the possibility of irreparable harm to the plaintiff if preliminary relief is denied; (3) the harm to the defendant if an injunction is issued; and (4) the public interest. The factors are weighed on a sliding scale, with the two more important factors being those of irreparable injury to the plaintiff without a decree and of likely harm to the defendant with a decree. If the balance of harms is not shown to be in plaintiff's favor, the importance of plaintiff's showing a likelihood of success on the merits increases.

Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 196 Fed. Appx. 166, 169 (4th Cir. 2006) (citing Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 196 (4th Cir. 1977)); accord In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 526 (4th Cir. 2003).  The Plaintiff bears the burden of showing that each of these factors supports an injunction.  In re Microsoft, 333 F.3d at 526.

In order to show a *prima facie* case of copyright infringement, the party complaining of infringement must show ownership of a valid copyright and unauthorized copying of the protected work by the infringing party. Universal, 196 Fed.Appx. at 172.  Registration of a copyright is *prima facie* evidence of the validity of a copyright in any judicial proceeding brought within five years of the first publication.[4]  17 U.S.C. §410(c).  Once a *prima facie* claim of copyright infringement is made, the holder of the copyright is entitled to a presumption of irreparable harm.  Universal, 196 Fed. Appx. at 169-170 (citing Serv. & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 690 (4th Cir. 1992)).

---

[4]The copyright at issue was registered in 2007.

**DISCUSSION**

**The motion to set aside entry of default.**

In his motion, Gupta did not provide any grounds to support his request to set aside the entry of default.  See <u>Payne</u>, 439 F.3d at 204 (court should consider whether the moving party has a meritorious defense, acted promptly, has personal responsibility, caused prejudice, has history of dilatory conduct and availability of less serious sanctions). During the hearing, he stated merely that he had consulted a website for an unidentified federal district court and was advised that mailing the Answer on the due date would be sufficient.  The Court has reviewed the Answer and finds that whether it sets forth a meritorious defense is debatable.  See <u>Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp</u>., 843 F.2d 808, 812 (4th Cir. 1988) (a meritorious defense requires a proffer of evidence from which a finding could be made for the defaulting party).  Nonetheless, in an abundance of caution, the Court finds that it would be premature to rule against the Defendant on this factor based on his *pro se* status.  See, e.g., <u>Lolatchy v. Arthur Murray, Inc.</u>, 816 F.2d 951, 954 (4th Cir. 1987) (Rule 55(c) should be liberally construed in order to provide relief from the onerous consequences of defaults); <u>Belvac</u>

Production Machinery, Inc. v. Standard Indus., 2007 WL 1189644

(W.D.Va. 2007) (defendant's burden to show a meritorious defense is

minimal); United States v. Fox, 2007 WL 4395698 (W.D.N.C. 2007) (*pro se*

parties are entitled to reasonable safeguards when confronted with matters

that lead to summary disposition of the case).

Gupta did act promptly to set aside the default, even though the

delay in serving the Answer was his own fault.  See Burton v. The TJX

Companies, Inc., 2008 WL 1944033 (E.D.Va. 2008) (meritorious defense

and reasonable promptness factors given the most weight) (citing Consol.

Masonry Fireproofing, Inc. v. Wagman, 383 F.2d 249, 251 (4th Cir. 1967)).

Nonetheless, the only prejudice to the Plaintiff is the prejudice of being

required to have its case tested on the merits.  Roberts v. Genesis

Healthcare Corp., 2007 WL 530493 (D.Md. 2007); Eaker v. Overturf, 2008

WL 2945454 (M.D.N.C. 2008) (no prejudice where discovery had not yet

occurred).

At this point, there is no history of dilatory conduct on Gupta's part.

Thus, entering judgment based on this default would be unwarranted.  See

Tolson v. Hodge, 411 F.2d 123, 130 (4th Cir. 1969) (any doubts about

setting aside the default should be resolved in favor of hearing the case on

the merits); Wolfe v. National Medical Care, Inc., 2008 WL 200311

(S.D.W.Va. 2008) (imposing attorneys' fees as less drastic sanction).

As a result, the Court finds that Gupta has shown good cause for

setting aside the entry of default. Default is therefore set aside and, as

noted during the hearing, the Defendant's Answer was received by the

Court during the hearing and is deemed filed as of October 21, 2008.

**The motion for a preliminary injunction.**

> [P]reliminary injunctions are extraordinary interlocutory remedies that are granted in limited circumstances and then only sparingly. The limited circumstances amount to the demonstration of a need to protect the status quo and to prevent irreparable harm during the pendency of the litigation to preserve the court's ability in the end to render a meaningful judgment on the merits. If that need is not presented, then a preliminary injunction should not be considered. But if the need is demonstrated, then the entry of a preliminary injunction rests in the discretion of the district court, which is informed by balancing factors under [the Blackwelder analysis].

In re Microsoft, 333 F.3d at 526. When weighing the Blackwelder factors in

a copyright infringement case, the two most important factors are the

irreparable harm to the plaintiff and the likely harm to the defendant. Id.

If Agdata has established a *prima facie* case of copyright

infringement, then it is entitled to a presumption of irreparable harm as well

as a presumption of likelihood of success on the merits.  <u>Microsoft</u>, 333 F.3d at 534-36; <u>Serv. & Training, Inc. v. Data Gen. Corp</u>., 963 F.2d 680, 690 (4th Cir. 1992) ("Once [the plaintiff] established a *prima facie* claim of copyright infringement, the district court was entitled to presume that [the plaintiff] could show both probable likelihood of success on the merits and irreparable harm."); <u>Palmetto Builders and Designers, Inc. v. UniReal, Inc.</u>, 342 F.Supp.2d 468, 471 (D.S.C. 2004) ("In deciding motions for preliminary injunctions in the context of copyright law, a lower standard of proof is applied. ... '[I]f a plaintiff establishes a *prima facie* case of copyright infringement, a court is entitled to presume that [the plaintiff] could show both probable likelihood of success on the merits and irreparable harm.'").

"To establish a claim for copyright infringement, a plaintiff must prove that it owned a valid copyright and that the defendant copied the original elements of that copyright."  <u>Lyons Partnership, L.P. v. Morris Costumes, Inc.</u>, 243 F.3d 789, 801 (4th Cir. 2001).  As noted *infra*, registration of the copyright is *prima facie* proof of its validity.  <u>See</u> <u>Universal</u>, 196 Fed. Appx. at 169-170.  Agdata has attached a copy of the certificate of registration of its ClaimsREDI copyright and therefore the Court finds that Agdata owned a valid copyright.

Even if there were no direct evidence that Gupta copied the ClaimsREDI copyright, Agdata may, for the purposes of a preliminary injunction, create the presumption of copying by showing that Gupta had access to the copyrighted work and that his product is "substantially similar" to the protected work.  Lyons, 243 F.3d at 801.  Here, Gupta has admitted that he had access to the software and its source code.  Moreover, Agdata has shown that Gupta worked on developing the software as well as the Encounter Bypass functionality for the copyrighted software.  The Court therefore finds that Gupta had access to the copyrighted ClaimsREDI software and its source code as well as to the Encounter Bypass functionality for the copyrighted product.

In order to show that the Green Data Solutions product is "substantially similar" to the copyrighted ClaimsREDI software, Agdata must show that the two works are extrinsically similar because "they contain substantially similar ideas that are subject to copyright protection" and that they are intrinsically similar because they "express those ideas in a substantially similar manner from the perspective of the intended audience of the work."  Lyons, 243 F.3d at 801.  The Court finds that the slide show presentation on the website reflects that the Green Data

Solutions product contains substantially similar ideas to the copyrighted ClaimsREDI software. That is, both products allow medical providers to put their insurance claims data into the system and the software of both systems automatically reformats the information into the form required by the insurance company to which the claim is submitted. Indeed, on the website and in his emails, Gupta touted the Green Data Solutions product as performing those very functions. The Court also finds that Agdata has shown that it is highly unlikely that Gupta, who had access to the copyrighted source code throughout his employment, could have independently developed such complicated software within a thirty-day period of being terminated from his employment.

As to the issue of intrinsic similarity, the fact that Agdata's customers contacted it about Gupta's emails – emails Gupta acknowledges that he sent – soliciting their business shows that his product "express[ed] those ideas in a substantially similar manner from the perspective of the intended audience of the work." Lyons, 243 F.3d at 801.

The Court finds that Agdata has proven that it owns a valid copyright and that Gupta copied the original elements of that copyright. Lyons, 243 F.3d at 801. As a result, Agdata has established a *prima facie* case of

21

copyright infringement and it is entitled to a presumption of irreparable harm and of a likelihood of success on the merits.  In re Microsoft, 333 F.3d at 534-36;  Bowe, Bell & Howell Co. v. Harris, 145 Fed. Appx. 401, 403-04 (4th Cir. 2005).

Moreover, applying the Blackwelder factors in the traditional manner reaches the same result.[5]  "Irreparable injury often derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights."  Christopher Phelps & Associates, LLC v. Galloway, 492 F.3d 532, 544 (4th Cir. 2007).  And, "[d]amages at law will not remedy the continuing existence of [Agdata's] design in the [Green Data Solutions product]."  Id.; Bowe, 145 Fed. Appx. at 404.

In contrast, the harm to Gupta arising from the granting of a preliminary injunction would be relatively small because his business is evolving and he is able to work with other types of computer software.  Id.  By the same token, an injunction would diminish the chances of future

_____

[5]In eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 392-93, 126 S.Ct. 1837, 1840, 164 L.Ed.2d 641 (2006), the Supreme Court disapproved of the general rule unique to patent cases that a *permanent* injunction automatically issues when a party proved a *prima facie* case of patent infringement.  After eBay, the Fourth Circuit used the traditional Blackwelder balancing test in determining whether to issue a *permanent* injunction in a copyright case.  Christopher Phelps & Associates, LLC v. Galloway, 492 F.3d 532, 544 (4th Cir. 2007).  Out of an abundance of caution, the Court undertakes the more traditional balancing test in addition to the presumption.

copying.  Christopher Phelps, 492 F.3d at 544.  Moreover, Gupta is only being enjoined from conduct to which he agreed in his contracts with Agdata.  As such, the harm suffered by Gupta by the entry of this preliminary injunction is minimal, if any.

Since Agdata has established that its copyright has been infringed, the likelihood of success tips in its favor.  Bowe, 145 Fed. Appx. at 403-04. As for the issue of public interest, Gupta's emails and new product are likely to cause confusion in the marketplace.  Bowe, 145 Fed. Appx. at 404.  This impacts the public, which also has an interest in preventing the unauthorized reproduction of copyrighted material.  Id.; see also Candle Factory, Inc. v. Trade Associates Group, Ltd., 23 Fed. Appx. 134 (4th Cir. 2001) (valid copyright leads to presumption that defendant will not suffer harm).

The Court also finds that Agdata is entitled to injunctive relief in connection with its claims that Gupta has breached the Asset Purchase Agreement and Second Employment Agreement.  The same analysis concerning harm applies as recited above.  That is, if the preliminary injunction is not granted, Agdata will suffer irreparable harm which cannot be compensated by monetary damages.  Bowe, 145 Fed. Appx. at 404.  By

the same token, Gupta has admitted that he is able to find other employment.  Indeed, he agreed during the hearing that Agdata was entitled to enjoin him from breaching the non-compete, non-solicitation and confidentiality provisions of the contracts.  The harm to Gupta arising from enforcing these provisions is therefore minimal, at best.

As for the likelihood of success, Agdata has established a *prima facie* case that Gupta has breached the non-compete, non-solicitation, and confidentiality provisions of both the APA and the Second Employment Agreement.  Gupta candidly admits sending the emails at issue and openly acknowledged that he is "targeting" the healthcare industry, which would include Agdata's customers, with his product.  He acknowledges that he is not allowed under the terms of either contract to solicit Agdata's customers.  His argument is that he is allowed to send the emails at issue because Agdata refused to provide him with a customer list, a posture on Agdata's part which is warranted under the circumstances.  He also claimed that asking for investments in his product was not the same as attempting to sell the product to Agdata's customers.

These arguments overlook the language of the contracts.  Gupta agreed that he would neither "directly [n]or indirectly" solicit customers,

consult with any person in competition with Agdata, use any information or knowledge gained by him while employed in connection with a person competing with Agdata, or invest money in any person or entity in competition with Agdata.  Even if there were evidence that Gupta is seeking investors, his conduct nonetheless constitutes consultation with "investors" and perspective "investors" in a product in direct competition with Agdata's products.  In the process of so doing, Gupta is using information and knowledge gained by him while working at Agdata, both as to the copyright and as to the Encounter Bypass functionality.

The public has an interest in enforcing restrictive covenants that protect business interests.  Bowe, 145 Fed. Appx. at 404.  The Court therefore finds that the Blackwelder analysis justifies granting a preliminary injunction.  Because the Court finds injunctive relief appropriate pursuant to the copyright and contract claims, it is unnecessary to reach the other claims for violations of the North Carolina Unfair and Deceptive Trade Practices Act and the North Carolina Trade Secrets Protection Act.

The Defendant has not challenged the reasonableness of the territory identified in the Agreements within which Defendant's actions are limited.  Therefore, the Court finds that said territory is reasonable.

**ORDER**

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion to
Revoke Entry of Default, Dismiss the Hearing for Preliminary Injunction
[Doc. 13] is hereby **GRANTED IN PART AND DENIED IN PART** and the
motion to dismiss the hearing is hereby **DENIED** as moot and the motion to
set aside entry of default is hereby **GRANTED**.  The Entry of Default is
**SET ASIDE** and the Defendant's Answer is received by the Court effective
October 21, 2008; and

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Temporary
Restraining Order and Preliminary Injunction [Doc. 6] is hereby **GRANTED
IN PART AND DENIED IN PART.**  The Defendant Raj Gupta is hereby
**PRELIMINARILY ENJOINED** from the following actions, either alone or in
conjunction with any other individuals or business interests, however
defined, and/or in any manner in concert with other individuals or business
interests, however defined, and/or from aiding and abetting, counseling,
commanding or procuring the following actions:

1.     Soliciting customers located in the territory, as those terms are
       defined in the Asset Purchase Agreement and the Second
       Employment Agreement, for the purpose of providing goods or

services identical to or reasonably substitutable for the goods or services provided by Agdata, copies of which are attached to the Complaint herein;

2. Selling or offering for sale, or delivering or distributing by any means whether physical or electronic, any product that contains all or any portion of Agdata's copyrighted ClaimsREDI software or Encounter Bypass functionality or software, and/or any other software or asset, or reproduction thereof, that is the subject of the non-compete, non-solicitation or confidentiality provisions of the Asset Purchase Agreement and Second Employment agreement, copies of which are attached to the Complaint herein.

3. Performing services that are similar or substantially similar to the duties outlined in the Second Employment Agreement within the territory for any customer of Agdata, as those terms are defined in the Asset Purchase Agreement and the Second Employment Agreement, copies of which are attached to the Complaint herein;

4. Consulting with, using or otherwise lending knowledge, assistance or expertise of the type gained or utilized while employed by Agdata or HDL, including the identity of Agdata's customers, to any person, if

such person engages in competition with Agdata in the territory, as those terms are defined in the Asset Purchase Agreement and the Second Employment Agreement, copies of which are attached to the Complaint herein; and

5.      Investing capital in or lending money to any person, if such person engages in competition with Agdata in the territory, except for the ownership of two percent (2%) or less of the stock of a publicly traded company, as those terms are defined in the Asset Purchase Agreement and the Second Employment Agreement, copies of which are attached to the Complaint herein.

**IT IS FURTHER ORDERED** that this injunction shall become effective upon the posting by Agdata of a surety bond in the amount of $20,000.00 for the payment of any costs and damages that may be suffered by Gupta if he is later found to have been wrongfully enjoined.

**IT IS FURTHER ORDERED** that this preliminary injunction shall continue until June 30, 2009, unless modified prior thereto by further Order of this Court.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Temporary Restraining Order is hereby denied as moot.

**IT IS FURTHER ORDERED** that the Clerk is directed to mail a copy of this Preliminary Injunction to the Defendant via Certified Mail, Return Receipt Requested.

**IT IS FURTHER ORDERED** that on or before fourteen days from entry of this Order the parties shall file a certificate of Initial Attorneys Conference, modified (if necessary) to reflect Gutpa's *pro se* status.

Signed: October 30, 2008

Martin Reidinger
United States District Judge